**BATH IRON WORKS CORPORATION et al., Defendants, Appellants,**

v.

**BATH MARINE DRAFTSMEN'S ASSO-CIATION, Plaintiff, Appellee.**

No. 6967.

United States Court of Appeals First Circuit.

Heard Nov. 9, 1967.

Decided April 22, 1968.

**408**

Daniel T. Drummond, Jr., Portland, Me., with whom John P. Carey, Bath, Me., Hugh G. E. MacMahon and Drummond, Wescott & Woodsum, Portland, Me., were on brief, for appellants.

Sidney W. Wernick, Portland, Me., with whom Berman, Berman, Wernick & Flaherty, Portland, Me., was on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

This appeal challenges a declaratory judgment of the district court under 28 U.S.C. § 2201 and 29 U.S.C. § 185 that the collective bargaining agreement between Bath Iron Works Corporation (Bath) and the Bath Draftsmen's Association (the Union), representing certain employees in Bath's drafting and technical departments, superseded a similar agreement between Hyde Windlass Company (Hyde) and the same union concerning drafting and other personnel, when the latter corporation was merged with the former.[1]

Bath is principally engaged in the building of ships. It is, however, interested in diversification. Almost all of its draftsmen at present are "systems draftsmen", devising plans for integrating electrical, piping, and other systems into the complete vessel. Bath's recognition of the Union dates from 1940. Its most recent collective bargaining agreement defines the bargaining unit as "those employed by [Bath] as laboratory technicians, radiographers, draftsmen and all others employed in the Drafting and Technical Departments. * * *" It is a unit of some 100 employees, of whom 70 to 75 are draftsmen.

Hyde, a machinery producing corporation, divides its manufacturing activities almost equally between marine and industrial equipment. In the former category it makes steering gears, windlasses, capstans, winches, and towing chocks. In the latter category it makes pumps, pulp molding machinery, presses, and missile handling equipment. It submits bids for work to its customers, including Bath. Its draftsmen, called "component draftsmen", design particular machines and their parts. In 1962 the Union was certified, pursuant to a consent election, as the exclusive bargaining agent for Hyde. The unit was described in the most recent collective bargaining agreement as "those employees in the Engineering Department of [Hyde], including draftsmen, material order clerks and plan clerks. * * *" It contains 30 to 35 employees of whom 20 to 25 are draftsmen.

---

1. The agreement between Bath and the Union will be referred to hereinafter as the Bath contract; that between Hyde and the Union as the Hyde contract.

Hyde and Bath are contiguous. They existed as entirely separate enterprises until 1961 when Hyde became a wholly-owned subsidiary of Bath. In 1964, during the terms of both collective bargaining agreements, the two companies merged, with Bath surviving as the corporate entity. Since the merger, Hyde has continued to do business as before, maintaining its own management, personnel, production, purchasing, sales, engineering, payroll, security, and accounting units. The only noteworthy change, so far as concerns this case, has been the interposition of a Technical Manager at the Hyde plant between the General Manager and the various department heads. The Hyde division of Bath, as it now is called, is a separate profit center in Bath's operations. There has been no interchange of Bath and Hyde personnel except in the case of one welder who, upon transferring to Hyde, for reasons of his own, came as a new employee, waiving his seniority, and subjecting himself to a waiting period for insurance benefits. If a Bath "systems draftsman" were assigned work at Hyde, or a Hyde "component draftsman" were assigned systems work at Bath, further training would be required.

The merger took place on September 1, 1964. Bath immediately notified the Union that it was assuming Hyde's collective bargaining agreement. The Union responded that this agreement had been terminated by the merger and that Hyde's engineering department employees were automatically covered by the Bath contract. Suit was then brought alleging the exclusive applicability of the Bath contract, and hearing was had before the district court. In the meantime, Bath petitioned the National Labor Relations Board to determine whether its draftsmen's bargaining unit should include Hyde draftsmen. The Board responded that, on the record before it, it could not rule that the two units had merged nor could it say that only separate units were appropriate, and concluded that the issues addressed to it were not properly to be resolved at that time.

At this point we note in the margin the differences between the two contracts.[2] Except for job classifications and pay rates, they are few and minor. Each contract contains 24 clauses, the overwhelming majority of which are identical and both provide for the arbitration of grievances arising under their respective agreements.

Both parties make equally forceful arguments, if their premises are accepted. Appellant construes John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); Wackenhut Corp. v. Intern. Union, Unit. Plant Guard Workers, 332 F.2d 954 (9th Cir.

---

2. Each contract lists three classes and subclasses of draftsmen. The Hyde draftsmen ratings carry pay rates from six to fifteen cents an hour below those of Bath. Hyde's material requisition and drafting clerks receive lower pay than do Bath's chief order, order, and chief plan clerks. Hyde's work leaders receive less than do Bath's. Bath draftsmen receive an automatic pay raise if production and maintenance workers do; Hyde draftsmen do not.

There are other differences. Bath's employees are allowed to present their own grievances without assistance of the Union. Hyde's employees are not only denied this privilege but are held to waive any grievance if they do not strictly observe the time schedule established for each step in the process; Bath employees do not labor under this imperative. The Bath contract contains a no-strike clause; the Hyde contract does not.

Hyde employees are promised an equal distribution of overtime work and a policy of promotion from within while Bath employees are not. Hyde employees are not required to give notice of their intention not to work on a holiday declared a work day; Bath employees are subject to this requirement. A Bath employee, but not a Hyde employee, forced to lose time because of injury is paid for the full eight hour shift on which he received the injury. Bath employees receive from 12 to 18 days sick leave; Hyde employees receive from 10 to 20. Hyde commits itself to giving vacation pay on separation and rehire while Bath does not. The record is silent as to the content of the pension and accident and health insurance benefits under each contract.

1964); and United Steelworkers of America v. Reliance Universal, Inc., 335 F.2d 891 (3d Cir. 1964), as establishing that, if there is "substantial continuity in the business enterprise before and after a change in ownership, a collective bargaining agreement of a predecessor employer survives the change in ownership and remains a viable agreement, the basic charter of labor relations, binding on the union and the successor employer."[3] Were this not so, appellant argues, a successor corporation would have no way of estimating the cost of wages, benefits, and other obligations is was assuming.

Appellee starts with the opposite proposition that the Bath contract applies, in its terms, to the draftsmen and other technical department employees of Hyde since they now are Bath employees. It then says that nothing in *Wiley* should upset the ordinary impact of common (and federal labor) law on the applicability of the Hyde contract, pointing out that *Wiley* specifically excepted the situation where the successor company's employees had a collective bargaining contract. Since here there is a union in the successor plant, reasons appellee, there is no danger of the "tests of strength between contending forces" and thus no reason to disregard traditional common law principles of contract. It concludes by reminding us of the policy of the law to protect workers who have had no voice in corporate reorganization.

This case presents a novel facet of the *Wiley* syndrome. Unlike mergers of distant corporations with existing area differentials, we are concerned with the merger of a wholly-owned subsidiary and its parent, both having very similar agreements with the same union except for key job rates, where both continue their different operations on adjoining premises. Unlike Wiley, Wackenhut, Reliance, and Monroe Sander Corp. v. Livingston, 377 F.2d 6 (2d Cir.), cert. denied, 389 U.S. 831, 88 S.Ct. 97, 19 L. Ed.2d 89 (1967), the surviving enterprise is not only under contract with a union but with the same union. Unlike McGuire v. Humble Oil & Ref. Co., 355 F.2d 352 (2d Cir.), cert. denied, 384 U.S. 988, 86 S.Ct. 1889, 16 L.Ed.2d 1004 (1966); Southern Conference of Teamsters v. Red Ball Motor Freight, Inc., 374 F.2d 932 (5th Cir. 1967); and L. B. Spear & Co., 106 NLRB 687 (1953), there is no conflict between different unions.

If these post-*Wiley* cases, because of their significantly different factual situations, do not help us, neither does the holding in *Wiley* itself. That decision merely ordered recognition of "the central role of arbitration in effectuating national labor policy." 376 U.S. at 549, 84 S.Ct. at 914. But here the parties are agreed that arbitration ought to take place. The dispute revolves about whether the Bath contract or the Hyde contract shall be the basis for that arbitration. Indeed it is possible that when arbitration is concluded the parties might stand in the same position, whatever contract is used as the starting point.

---

3. We think this paraphrase overstates the holding in *Wiley*, since the Court, though urged to do so by the respondent union and the AFL–CIO as amicus curiae, refrained from ruling that the successor was bound by the collective bargaining agreement of its predecessor, and, instead, restricted its holding to survival of a duty to arbitrate. A perceptive Note, The Contractual Obligations of a Successor Employer Under the Collective Bargaining Agreement of a Predecessor, 113 U.Pa.L.Rev. 914, 924–27 (1965), suggests that expiration of the agreement in *Wiley*, the narrow request of the union merely to compel arbitration, and the possible exercise of judicial restraint in what was already bound to be a groundbreaking decision do not satisfactorily account for the Court's refusal to do more than compel arbitration. "A more plausible interpretation * * * is that the Court, as a matter of substantive federal labor policy, preferred arbitrators to the courts as the proper tribunal for resolving such disputes." Id. at 925.

Of course, where union and successor company agree to be bound by a predecessor contract, as did Bath and a different union representing Hyde's maintenance and production employees, there is no problem.

Addressing this question, we see no satisfactory solvent in conventional contract or corporate law.[4] We are therefore impelled to examine the pre- and post-merger employment situation for some idea of the equities, consistent with national labor policy. Over the years prior to the merger, the Hyde employees had bargained with a relatively small, independent company. Factors unknown to us, economic and possibly non-economic, have resulted in the present Hyde pattern of job classification, pay rates, and other benefits. Upon consummation of the merger, in which the Hyde employees played no part, they found themselves employees of a division of a much larger company, with final decision-making power in a different and more remote hierarchy, and with far greater financial resources. Though a fact not apparent in the day-to-day conduct of operations, the work universe of the Hyde employees had changed significantly.[5]

If there had grown up a real disparity in compensation for work of comparable skill and responsibility arising out of the disparate financial resources of Bath and Hyde, that cause disappeared with the merger. A disparity which could be tolerated when neighboring employers operated separate entities in un-like circumstances might well be a source of dissatisfaction, unrest, and even tests of strength after merger. We do not say that any such disparity in wages and benefits for work of comparable demand exists. But we do say that after a corporation in the situation before us has defined and settled all questions of management authority and responsibility through merger, it is not unfair to require that employee wages and benefits also be subjected to a limited scrutiny to the end that discrepancies in treatment attributable *solely* to limited bargaining power stemming from more limited financial capacity on the part of the smaller and now merged corporation may be rectified.

Both parties have conceded that, whatever contract is chosen as the vehicle for post-merger adjustments, arbitration will be required to make that adjustment equitable. But to recognize that some arbitration is required, even for the limited purpose we have defined, is to face the fact that the Hyde contract provides no vehicle whatsoever. Any changes in compensation of the prior Hyde employees would constitute cancellation of old provisions and substitution of new provisions in direct conflict with the Hyde contract.[6] Such changes incor-

4. The company argues in this regard that compulsory novation through merger preserves the Hyde contract. The Union relies on the district court's statement that novation requires mutual consent, lacking here, and its finding that as a matter of contractual interpretation, the Bath Recognition Clause applies to the former Hyde employees.

5. It could be argued that this change occurred when Bath acquired complete stock ownership of Hyde, and that the Union, having chosen to bargain with a wholly owned subsidiary, should be compelled to adhere to the resulting agreement. Apart from the danger to industrial stability resulting from a rigid rule of election whenever majority stock positions change, we note that even though complete stock ownership of Hyde by Bath made ultimate control legally possible, this fact did not enlarge Hyde's ability to pay better wages or benefits.

6. We are mindful of our Chief Judge's preference for improvisation on the basis

of the Hyde contract, consistent with the disposition of the court in United Steelworkers of America v. Reliance Universal, Inc., 335 F.2d 891 (3d Cir. 1964), but we have been impressed by the criticism of that part of the *Reliance* opinion in Note, 113 U.Pa.L.Rev. 914, 928 n. 65 (1965):

"The court in *Reliance* cited United Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574 [80 S.Ct. 1347, 4 L.Ed.2d 1409] (1960), and Cox, Reflection Upon Labor Arbitration, 72 Harv.L.Rev. 1482, 1493–98 (1959), as supporting the view that an arbitrator can modify the agreement. 335 F.2d at 895. However, these authorities present the position that an arbitrator can in effect expand a collective bargaining agreement only when it is silent or ambiguous on a particular issue. They do not support a change of contract terms which are already in the agreement."

porated in the Bath contract, however, would be in the nature either of applying some Bath rates to old Hyde employees or the insertion of appropriate schedules supplementing the Bath contract where it was silent. We therefore see no alternative, if any post-merger adjustment is to be examined and made, to using the Bath contract as the foundation.

Accordingly, we assign to the Union— the party seeking adjustments—the responsibility of initiating the arbitration proceeding as well as the task of identifying factors which it concludes merit higher wages and improved benefits. To the extent that the arbitrators, after considering the Union's case and the company's response, find that a disparity in compensation does exist for work of comparable skill and further find that such disparity results from Hyde's pre-merger smaller purse and not from other factors such as more attractive working conditions, wages and benefits for Hyde draftsmen should approach those existing under the Bath contract.

The Bath contract shall govern any arbitration but shall not, in the absence of arbitration, constitute the controlling contract. As so modified the judgment of the District Court is affirmed. No costs on appeal.

ALDRICH, Chief Judge, dubitante.

I find it difficult to associate myself with this opinion, in part because I do not know how large a principle it may be thought to stand for. That unforeseen circumstances may warrant a change in contractual terms is not altogether unheard of. The change, however from wholly owned subsidiary to merger does not seem presumptively a substantial one. Perhaps, however, the burden of proof that the court places upon the union sufficiently takes care of this matter.

I am more troubled by the court's holding that arbitration must start from the Bath contract, agreeing with the Third Circuit that it is possible for the Hyde contract to continue in effect subject to abrogation where necessary. United Steelworkers of America v. Reliance Uni-

versal, Inc., 3 Cir., 1964, 335 F.2d 891; see John Wiley & Sons, Inc. v. Livingston, 1964, 376 U.S. 543, 551 n. 5, 84 S.Ct. 909, 11 L.Ed.2d 898; Comment, 66 Colum. L. Rev. 967, 972 (1966). How much difference this makes in the case at bar is questionable. How it affects the precedential value of this rather unusual case is more bothersome.