**JONES MOTOR COMPANY, INC.,**
**Plaintiff, Appellant,**

v.

**CHAUFFEURS, TEAMSTERS AND HELPERS LOCAL UNION NO. 633 OF NEW HAMPSHIRE, Etc., et al., Defendants, Appellees.**

No. 81–1341.

United States Court of Appeals,
First Circuit.

Argued Oct. 7, 1981.
Decided Feb. 19, 1982.

---

Philip J. Moss, Boston, Mass., with whom Morgan, Brown, Kearns & Joy, Boston, Mass., was on brief, for appellant.

Robert Christy, Manchester, N.H., with whom Christy & Tessier, Manchester, N.H., was on brief, for appellees.

Before BOWNES and BREYER, Circuit Judges, and BONSAL,* Senior District Judge.

BREYER, Circuit Judge.

Jones Motor Company (the "Company") appeals from a decision of the United States District Court for the District of New Hampshire denying the Company's motion for summary judgment and dismissing its complaint. The Company contends that the district court erred both (1) in holding that its claim against Chauffeurs, Teamsters and Helpers, Local Union No. 633 (the "Local") for damages arising from a strike, allegedly illegal under the parties' collective bargaining agreement, was subject to arbitration, and (2) in denying its motion for summary judgment. We agree, reverse, and remand.

I

The facts are largely undisputed. The Company, a Pennsylvania corporation, is an interstate trucking company with a freight terminal in Nashua, New Hampshire. The Local is an International Teamsters Union affiliate. The Company and the Local have signed a collective bargaining contract that has two separate sets of provisions. One set consists of the "National Master Freight Agreement"—a set of provisions found in Teamster contracts throughout the Nation. The second set consists of the "Northern New England Supplement"—separate local provisions found in New England Teamster contracts. This case rests upon claims by each party that the other has violated the contract ("Master" plus "Supplement") in effect between them.

The strike that the Company claims unlawful arose as follows: On the night of December 18, 1979, Roger Pellerin, a Local member, began his 6:30 p. m. to 2:30 a. m. workshift on the loading platform of the Company's Nashua, New Hampshire, freight terminal. It was a very cold night. At approximately 8:30 p. m. Filteau, another employee, entered the office of the supervisor, Joseph Lacourse, and said that he was sick; at 10:00 p. m. Filteau was granted permission to leave early. Pellerin continued to work by himself, occasionally entering the office to warm up. Pellerin did not stop working at 11:30 p. m. for his usual meal break, but at approximately 11:45 p. m. he entered Lacourse's office, had a brief conversation with Lacourse, punched his time sheet, and left. What Pellerin said to Lacourse before leaving is a matter of dispute. Lacourse in his affidavit of December 28, 1979, recalls that Pellerin "told me that he was leaving and was not coming back." Pellerin's version is that he felt frozen, weak, chilled to the bone, and that

* Of the Southern District of New York, sitting by designation.

I skipped my scheduled luncheon break and reported to supervisor Joseph Lacourse in the dispatcher's room that I was frozen, the cold was going right through me and had to go home because I couldn't take it anymore and wouldn't return for the balance of the shift. I interpreted Lacourse's basic silence as consent and went home at approximately 11:45 p. m. before my shift would otherwise have terminated at approximately 2:30 a. m.

Lacourse recorded in the Company log book that Pellerin went home frozen.

The next day the terminal manager, Arthur Dunham, conferred with Lacourse and the Local's shop steward, Roland Bouffard, about these events. According to Dunham, Bouffard felt that Lacourse's version of the facts showed that Pellerin had voluntarily quit. Dunham then instructed Lacourse that Pellerin was not allowed back to work. When Pellerin reported to work at 6:00 p. m., he asked Lacourse where his time card was. Lacourse responded that, in the opinion of the Company, Pellerin had voluntarily quit the night before.

The Local then took the position that Pellerin had not quit, but had gone home sick, and that the Company had thus "discharged" him without first discussing the disciplinary action with the Local Business Agent, Leo Kelly, as required by the Supplemental Agreement, Article 46(5)(a) and (b).[1] On December 20, 1979, the Company received a telegram from the Local threatening unspecified action against the Company unless it reinstated Pellerin. On December 26, 1979, Kelly telephoned Charles Long, the Company's vice-president for labor relations, to advise him that the Local would take economic action, unless the Company immediately reinstated Pellerin. Long responded that it was his understanding that Pellerin had quit and stated that the Company was willing to have the question of Pellerin's status submitted to the arbitrator specified in the contract, namely, the Northern New England Joint Area Committee, scheduled to meet on January 4, 1980. Kelly refused this suggestion.

On December 27, at approximately 7:00 a. m., Kelly called a strike and established a picket line in front of the Company's Nashua terminal. The Company then sent a telegram to the Local urging it to terminate the strike and submit the dispute over Pellerin's status to arbitration. On January 3, 1980, the Company filed an action in federal district court, claiming that the strike was illegal under the collective bargaining contract and seeking an injunction and damages.[2] The strike ended the next day.

At the same time that it ended the strike, the Local submitted a grievance on behalf of Pellerin to the contract arbitrators, the Northern New England Joint Area Committee. The arbitrators deadlocked. Pursuant to Article 46(1)(b) of the Supplemental Agreement, the grievance was then submitted to another arbitrator, the Eastern Conference Joint Area Committee. That body decided that Pellerin should be reinstated with full seniority on June 2, 1980, but that the preceding six months should be considered as a suspension for which no compensation, health and welfare, or pension contributions would be made. The

1. Supplemental Agreement Article 46(5)(a) and (b):

    (a) Scope of Procedure
    Prior to the taking of any other emergency action as contained in Sections (b) and (c) below, including resort to any court or administrative agency or tribunal, by either the Employer or the Local Union, all grievances or disputes shall be taken up and considered by the Employer and the Business Agent who shall make every attempt to settle same.
    (b) No Disciplinary Action
    The Employer shall take no disciplinary action other than emergency action against an employee, or group of employees, until after Section 5(a) above has been complied with in good faith. Upon the Employer and the Business Agent having exhausted all amicable discussions in attempting to settle the grievance or dispute, in whole or in part, then either party may take the unresolved question to arbitration as herein provided.

2. The Company also filed a motion for temporary restraining order, which was set down for hearing on January 8, 1980. Hearing on this motion was cancelled when the strike was terminated.

Committee also decided to issue a final warning letter to Pellerin in reference to walking off the job.

Meanwhile, the Company, while recognizing that its request for an injunction against the strike was moot, continued to press its district court claim for damages. The Local answered the complaint on the merits and both sides engaged in discovery. On the basis of the pleadings, the contract, answers to discovery requests, and affidavits, each side then moved for summary judgment. Neither side sought to present any additional evidence. The court heard oral argument on the summary judgment motions. Instead of deciding the summary judgment question, however, the court *sua sponte* decided that the basic issue in the case—which side breached the contract—should be submitted to arbitration, a matter that neither party had previously raised. And, it dismissed the complaint.

The Company moved for reconsideration, arguing that the collective bargaining agreement nowhere requires it to seek arbitration of its claim, and that even if the agreement required submission to arbitration, the Local had waived its right to insist

on arbitration by proceeding on the merits in court. The district court rejected both arguments and reaffirmed its earlier decision. The Company then appealed to this court, arguing (1) that the district court erred in finding that the Company *must* submit its damage claim to arbitration, (2) that the district court erred in finding that there was no waiver by the Local of its right to insist on arbitration, and (3) the district court erred in failing to grant the Company's motion for summary judgment. We do not pass on the Company's first claim of error, but we believe that the second and third claims of the Company are correct.

## II

We meet at the outset the question of whether the district court erred in dismissing the complaint on the ground that the collective bargaining agreement required that the matter be submitted to arbitration. The parties have vigorously argued various interpretations of the provisions in both the Master Agreement and the Supplement governing an employer's remedies in the case of an illegal strike.[3] We do not need

---

**3.** The question of whether the Company would, in the normal course, be required to submit its claim that the strike by the Union violated the collective bargaining agreement before coming to court to seek damages is not a simple one. The Master Agreement clearly establishes that the employer must first obtain a finding of liability by an arbitrator before seeking court-ordered damages:

> [T]he question of whether the International Union, Teamsters National Freight Industry Negotiating Committee, an Area Conference, Joint Council or the Local Union, separately or jointly, participated in an unauthorized work stoppage, slowdown, walkout or cessation of work in violation of the Agreement by calling, encouraging, assisting or aiding such work stoppage, etc., in violation of this Agreement ... shall be submitted to the grievance procedure at the national level, prior to the institution of any damage suit action.

Master Agreement Article 8(2)(c). The Supplemental Agreement, however, is not so strongly pro-arbitration. Article 46(1)(f) of the Agreement provides that "[n]othing herein shall prevent legal proceedings by the Employer where the strike is in violation of this Agreement." This clause, the "nothing herein" clause, has a

long history of inclusion in pre-1970 versions of the Master Agreement in which it was consistently interpreted as permitting an employer to go directly to court rather than to arbitration with a claim based on an allegedly illegal strike. *Stillpass Transit Company v. Ohio Conference·of Teamsters,* 382 F.2d 940, 942 (6th Cir. 1967); *Mason-Dixon Lines, Inc. v. Teamsters, Local 560,* 443 F.2d 807 (3d Cir. 1971); *California Trucking Ass'n v. Teamsters [1],* 86 L.R.R.M. 2643, 2647 (N.D.Cal.1974); *Granny Goose Foods, Inc. v. Teamsters,* 88 L.R.R.M. 2029, 2030 n.3 (N.D.Cal.1974); *California Trucking Ass'n v. Teamsters [3],* 94 L.R.R.M. 2981, 2984 (N.D.Cal.1977). After being deleted from the Master Agreement in 1970 (at which time it was replaced by language similar to that currently found in Article 8(2)(c)), the "nothing herein" clause was retained in at least some Supplements. In this context it was still interpreted to permit direct employer access to courts. *Pilot Freight Carriers v. Local 391,* 97 L.R.R.M. 3223 (M.D.N.C.1977). Given this consistent history of interpretation, the pointed change in the Master Agreement, and the retention of the exact language of the deleted "nothing herein" clause in the Supplement, it is clear that the Master Agreement and the Supplement conflict with regard to the issue of

to pass on these arguments because we believe that no matter what procedures were or were not required under the collective bargaining agreement, the Local has by its conduct in court waived any right that it might have to insist on arbitration.

The Local did not promptly request arbitration as to the strike's legality. Nor has it as yet acted to enforce any rights it may have under the contract to arbitrate this issue. The Company filed its complaint on January 3, 1980, and amended it on January 21, 1980. The Local answered the complaint, admitting jurisdiction on January 23, 1980. The individual defendants-appellees answered on May 23, 1980, also admitting jurisdiction. Depositions were taken (three by the Company and one by the Union) and a pretrial conference was held on July 2, 1980. The parties then filed cross-motions for summary judgment on the merits, briefed the merits, and had oral arguments on the merits on October 24, 1980. At no time during these proceedings did anyone mention arbitration. Rather, the first time arbitration was mentioned was more than a year after the Local filed its answer. That was February 19, 1981, when the district court decided, evidently completely on its own, that the issue should be heard by arbitrators, and dismissed the case.

■ Despite the policies favoring arbitration of contractual disputes, *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957), *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960), it has long been held that parties are free to waive their rights to arbitration under a contract and proceed to present their contractual dispute to a court. *Steelworkers v. Warrior & Gulf*, 363 U.S. at 582, 80 S.Ct. at 1352; *John Wiley & Sons, Inc. v. Livingston*, 376

U.S. 543, 547, 84 S.Ct. 909, 913, 11 L.Ed.2d 898 (1964). Moreover, such a waiver need not always be express; rather, courts can infer a waiver from the circumstances. *E.g., E. T. Simonds Construction Co. v. Local 1330, International Hod Carriers*, 315 F.2d 291 (7th Cir. 1963). In fact, in *Simonds* the Seventh Circuit warned that a party must "proceed with dispatch in seeking arbitration" if it does not wish to waive that right. And, the court there refused to stay court proceedings to allow arbitration of an "illegal-strike damages" claim when the parties seeking arbitration had previously (1) admitted jurisdiction in its answer to the complaint and (2) did not move for arbitration until four days after the pretrial conference, almost a year later. Similarly, in *Bath Marine Draftmen's Ass'n v. Bath Iron Works Corp.*, 266 F.Supp. 710 (D.Maine 1967), *aff'd with modifications*, 393 F.2d 407 (1st Cir. 1968), the district court found that the union, by not raising the issue of arbitration until during oral argument on the merits, had not "proceeded with dispatch in seeking arbitration" and had therefore waived arbitration.

The Supreme Court case of *Operating Engineers, Local 150 v. Flair Builders, Inc.*, 406 U.S. 487, 92 S.Ct. 1710, 32 L.Ed.2d 248 (1972), however, warns us against being overready to find a waiver. In that case, the company argued that the union had abandoned the agreement, which contained an arbitration clause, by failing to enforce it over a period of years. The Court held that the issue of laches was itself a matter for arbitration under the broad arbitration clause of the agreement. Similarly, this circuit in *General Dynamics Corp. v. Local 5, Industrial Union of Marine Workers*, 469 F.2d 848 (1st Cir. 1972), rejected a company claim that a union had repudiated an agreement's arbitration provision by refusing to

employer access to court and that resolution of the issue would necessarily involve determining which agreement, Master or Supplement, prevails in the case of a conflict. Neither the agreements nor the above-cited cases are clear on this point, and the policies involved—preservation of the uniformity of the national agreement versus enforcement of the intentions

of the parties which might be more accurately represented in the local agreement—are also at odds. Because we can decide this case without reaching this question, potentially of great importance to the interpretation of the collective bargaining agreement in many respects, we express no view upon its merits.

comply with a previous arbitration order to cease and desist from work stoppage. And in *H. & M. Cake Box, Inc. v. Bakery and Confectionery Workers, Local 45*, 493 F.2d 1226 (1st Cir. 1974), we rejected an employer's argument that the union's strike effectively amounted to a repudiation or waiver of the arbitration clause, effectively relieving the company of any duty to proceed to arbitration. Nonetheless, these cases do not hold or imply that parties can never waive arbitration or express a waiver in a course of conduct.

In these three cases, *Flair Builders, General Dynamics*, and *H. & M. Cake Box*, the conduct that allegedly amounted to a waiver or equivalent arbitration bar occurred *before* the court complaint was filed and involved issues well suited to an arbitrator's expertise (such as what facts occurred or whether those facts, under the contract's standards, should bar arbitration).[4] In contrast, the conduct allegedly constituting waiver here simply consists of a failure to seek arbitration while acquiescing in court resolution of the dispute. These facts took place *after* the complaint was filed; and the question of whether they amount to waiver calls for the expertise of a judge, not an arbitrator. Moreover, to require that parties go to arbitration despite their having advanced so far in court proceedings before seeking arbitration would often be unfair, for it would effectively allow a party sensing an adverse court decision a second chance in another forum. Further, to hold that courts *cannot* find waiver would waste scarce judicial time and effort. Finally, it is important that judges remain free to control the course of proceedings before them and to correct any abuse of those

proceedings by, for example, denying a belated motion for arbitration.

For these reasons, we agree with the Tenth Circuit's holding in *Reid Burton Construction, Inc. v. Carpenters District Council*, 535 F.2d 598 (10th Cir. 1976) (*Reid Burton I*), that *Flair Builders* was not intended to limit the power of a court to control proceedings before it. In that case, focusing on post-complaint actions by the parties, the Tenth Circuit affirmed the continued validity of *Simonds* and *Bath Iron Works*. In reversing the district court's holding that the issue of whether post-complaint actions amounted to waiver was required to be submitted to arbitration, the Tenth Circuit said:

> The equitable defense in the instant case arose from alleged 'evasive' and 'dilatory' pleading tactics by the unions in the district court proceedings, specifically the fact that the unions claimed that Local 1340 was not a party to the collective bargaining agreement, later admitting that while Local 1340 was not a party it was still bound by the provisions of the agreement. Courts must, of course, maintain judicial control of their own proceedings. Such power, we assert, is broad enough to include a court's determination of the validity of equitable defenses arising out of the action of parties before the court.

*Id.* at 603. *Flair Builders*, in the Tenth Circuit's view, is limited to the "proposition that certain broadly-worded arbitration clauses require the arbitration of equitable defenses arising out of the formation of a collective bargaining agreement or the processing of a grievance...." *Id.*[5]

---

4. It should also be noted that in *General Dynamics* and *H. & M. Cake Box* the defendants promptly raised the question of arbitration as a bar to judicial relief. Although that fact is not noted in either published opinion, the Company has brought the parties' briefs in those cases to the attention of this court. In those briefs it is clear that the union in *General Dynamics* raised arbitration as a bar in a motion to dismiss immediately following the filing of the complaint and that the union in *H. & M. Cake Box* raised the issue in its answer and again in its motion for summary judgment.

5. Neither *Flair Builders* nor *Reid Burton I*, nor indeed this case, raises the issue of an arbitration clause that provides for arbitration of a claim of "waiver through court proceedings." But, in any event, the *Reid Burton I* court wrote:

> [T]he language of Article XIII was broad enough to include disputes dealing with violations of the no-strike provision and would probably cover the type of laches defense raised in *Flair Builders*, but we do not believe that the parties ever intended to include the arbitration of equitable defenses arising out

In sum, there is no question but that the court had the power to find a waiver on the facts before it. Although a district court has a degree of discretion in determining whether or not to find a waiver, in this instance it would have been error to grant a motion seeking arbitration, and even more so to order arbitration *sua sponte*. The standards followed by the federal courts are set out in *Reid Burton Construction, Inc. v. Carpenters District Council*, 614 F.2d 698 (10th Cir. 1980) (*Reid Burton II*):

> In determining whether a party to an arbitration agreement, usually a defendant, has waived its arbitration right, federal courts typically have looked to whether the party has actually participated in the lawsuit or has taken other action inconsistent with his right, ... whether the litigation machinery has been substantially invoked and the parties were well into preparation of a lawsuit by the time an intention to arbitrate was communicated by the defendant to the plaintiff, ... whether there has been a long delay in seeking a stay or whether the enforcement of arbitration was brought up when trial was near at hand....

> Other relevant factors are whether the defendants have invoked the jurisdiction of the court by filing a counterclaim without asking for a stay of the proceedings, ... whether important intervening steps [*e.g.*, taking advantage of judicial discovery procedures not available in arbitration ...] had taken place, ... and whether the other party was affected, misled, or prejudiced by the delay....

614 F.2d at 702. (Citations omitted.) (Bracketed text in original.)

Applying these standards here, the facts establish a waiver. The Local was tardier in "raising" its arbitration defenses than were the defendants in *Simonds, Bath Iron Works*, or *Reid Burton I*. Indeed, the Local did more than simply acquiesce in the jurisdiction of the court here; it engaged in considerable discovery; it prepared the case for summary judgment; and it waited until after the district court had decided that issue before it decided to advocate the propriety of arbitration. Thus, the Local was ready to accept the determination of the district court on the merits, actually moving the court to find summarily for it. It took actions inconsistent with its now-asserted right, delaying the enforcement of arbitration, and affecting, misleading, or prejudicing the Company by its delay. We therefore hold that in this case the court should have considered the merits of the underlying dispute.

### III

Since both sides submitted this case to the district court for summary decision and since the case raises a single issue of contract interpretation, we shall decide that issue rather than remand this case to the district court for decision of that question. The question presented is simply whether the collective bargaining agreement permitted the Local to strike in response to the Company's dismissal of Pellerin or whether the agreement required the Local to go to arbitration instead. As we previously pointed out, the agreement consists of a Master Agreement and a Supplement.[6] After examining both sets of provisions, we have concluded that we need not face the question of which set predominates, *see* note 3, *supra*, for both sets forbid the strike.

---

of actions by a party in proceedings before a district court. Indeed, even had the parties so intended, we would conclude that such an agreement would clearly exceed the proper subject matter of a collective bargaining agreement and would not be enforceable in court....
535 F.2d at 604.

**6.** In this regard, the strike provisions parallel the provisions governing remedies in the case of a strike, *see* note 3, *supra*, reflecting the

natural *quid pro quo* of separate negotiations. As the Master Agreement was strongly pro-arbitration with regard to employer's remedies, so it is pro-arbitration with regard to strikes; only a narrow group of strikes are permitted. *See* note 11, *infra*. The Supplement, in contrast, provides for strikes in an additional category of cases and correspondingly permits broader employer remedies outside of arbitration.

The Master Agreement forbids all strikes except in four instances narrowly defined in Article 8(2)(a).[7] The Local does not argue that this strike falls within one of those four exceptions to the broad no-strike clause of the contract. The Supplemental Agreement makes no express addition to this short list of instances in which strikes are permitted, but Supplemental Agreement Article 46(5)(a) states that before taking certain emergency action "all grievances or disputes shall be taken up . . . by the Employer and the Union Business Agent who shall make every attempt to settle same." Article 46(5)(b) states that "[t]he Employer shall take no disciplinary action until" the consultation of 46(5)(a) "has been complied with," and Article 46(5)(d) says that "failure of the Employer to comply [with 46(5)] . . . shall be a violation of this Agreement and shall not be arbitrable. . . ." The Local argues that the Company violated this article (46(5)) by "disciplining" Pellerin. And, since a violation by the employer is "not . . . arbitrable," it can strike.

In evaluating the Local's interpretation, we are influenced by the settled legal policies that favor arbitration of disputes and that require ambiguities in collective bargaining agreements to be resolved in favor of arbitration. *Steelworkers v. Warrior & Gulf*, 363 U.S. at 582–83, 80 S.Ct. at 1352–53. Moreover, clauses broadly permitting one party to be the unilateral determiner of whether arbitration is or is not

required are disfavored. This corollary was made clear in *Warrior & Gulf* when the Supreme Court held that a clause providing that "matters which are strictly a function of management shall not be subject to arbitration" did not empower the company to determine what functions were management functions within the scope of that clause. Rather, the union's claim that contracting out was a violation of the collective bargaining agreement raised "a dispute 'as to the meaning and application of the provisions of [the applicable] Agreement' which the parties had agreed would be determined by arbitration." *Id.* at 585, 80 S.Ct. at 1354. *See also Gateway Coal Co. v. Mine Workers*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974); *NAPA Pittsburgh, Inc. v. Chauffeurs, Local 926*, 363 F.Supp. 54 (W.D.Pa. 1973), *aff'd*, 502 F.2d 321 (3d Cir. 1974), *cert. denied*, 419 U.S. 1049, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974); *Allied Division of Delaware Contractors Ass'n v. IOUE*, 351 F.Supp. 568 (D.Del.1972), *aff'd*, 485 F.2d 678 (3d Cir. 1973); *Koster Bakeries v. Teamsters, Local 802*, 96 L.R.R.M. 3315 (E.D.N.Y. 1977).

In the present case, we need not consider whether or not the nonarbitrability of disputes over employer's actions *clearly* within Articles 46(5) (*e.g.*, whether discipline took place before 46(5)(a)'s discussions were complete) gives rise to a concomitant right to strike, for the Company denies that its actions bring it within Article 46(5). The

---

**7.** Master Agreement Article 8(2)(a):

The parties agree that all grievances and questions of interpretation arising from the provisions of this Agreement shall be submitted to the grievance procedure for determination. Accordingly, except as specifically provided in other Articles of the National Master Freight Agreement, no work stoppage, slowdown, walkout or lockout shall be deemed to be permitted or authorized by this Agreement except:

(1) failure to comply with a duly adopted majority decision of a grievance committee established by the National Master Freight Agreement or Supplemental Agreement;

(2) a National Grievance Committee deadlock of a grievance rendered pursuant to the procedures provided herein; and

(3) failure to make health and welfare and pension payments in the manner required by the applicable Supplemental Agreement.

A "representation dispute" in circumstances under which the Employer is not required to recognize the Union under this Agreement is not subject to the grievance procedure herein and the provisions of this Article do not apply to such a dispute.

    \*    \*    \*    \*    \*    \*

We note that the Master Agreement seems to indicate that these categories of permitted strikes can be augmented only by provisions of the Master Agreement, not by a Supplement. But, as we previously stated, we do not need to reach the question of whether these provisions of the Master and Supplement conflict or which agreement prevails in the case of a conflict.

Company's position is that it did not discipline Pellerin, but rather that Pellerin walked off the job and by so doing, according to industry custom, voluntarily quit the employer. We express, of course, no opinion on whether the Company's version of the events of December 18 is correct or whether the Local is correct in maintaining that Pellerin was discharged. There was, however, undoubtedly a dispute over whether the Company's conduct brought it under Article 46(5) at all—a dispute highly analogous to the "management rights" question at issue in *Warrior & Gulf.* Given the analogy, it is apparent that the contract is at least ambiguous about whether disputes over what is "discipline" are nonarbitrable. And, we see nothing in, nor are we aware of any policy of, labor law suggesting that the Local should be able to determine unilaterally whether the Company actions in this case fall within Article 46(5). Rather, that question is a question about the interpretation of the contract. As such the contract requires that it be arbitrated:

> The parties agree that all grievances and questions of interpretation arising from the provisions of this Agreement shall be submitted to the grievance procedure for determination.

Master Agreement Article 8(2)(a).[8] Thus, in striking over the Pellerin dispute, instead of agreeing to submit it to arbitration, we believe that the Local violated the contract.

To hold otherwise, permitting the Local to decide for itself the lawfulness of strikes in advance of arbitration, would seem to "defeat the very purpose of the arbitration and no-strike provision," *Allied Division v. IOUE,* 351 F.Supp. at 571, and would be "at odds with the basic policy of national labor legislation to promote the arbitral process as a substitute for economic warfare." *Koster Bakeries v. Teamsters, Local 802,* 96 L.R.R.M. at 3317. We note further that the Eastern Conference of Teamsters, in a similar case, interpreted Article 46(5)(d) in a similar fashion. The record contains a letter signed by Joseph Trerotola, International Director, Eastern Conference of Teamsters, dated July 1, 1977, headed "Re: St. Johnsbury Trucking." It states:

> The facts, as we understand them, are as follows: The Company is instructing drivers to report for work three hours ahead of their regular starting times and treating as a voluntary quit the refusal to arrive as instructed. Similarly, the Company is informing laid off employees that their failure to arrive for work the next day will also be treated as a voluntary quit.
>
> Article 46, Section 5, forbids the imposition of discipline prior to exhaustion of the grievance system. The Company's use of the phrase "voluntary quit" is an attempt to take their actions outside of the Section 5 procedure. *We do not believe that this enables the Local to strike rather than arbitrate. We believe a grievance is the safer solution.*

(Emphasis added.)

For the forgoing reasons, we reverse and remand thé case to the district court with directions to enter summary judgment in favor of the plaintiff-appellant and to hear and determine the issue of damages.

*Reversed and remanded.*

---

**8.** "Agreement" in this context must be taken as a reference to the combined Master and Sup-  plemental Agreements. Master Agreement Article 1(3).