# United States Court of Appeals
## For the First Circuit

---

Nos. 01-1512
    01-1513
    01-1514
    01-1515

RESTORATION PRESERVATION MASONRY, INC., in its own capacity and
as subrogee of Dunlop Equipment Co., Inc.;
DUNLOP EQUIPMENT CO., INC.,

Plaintiffs, Appellees,

v.

GROVE EUROPE LTD.; GROVE WORLDWIDE CO., INC.; BRONTO SKYLIFT;
BET, PLC & PTP, LTD; FEDERAL SIGNAL CORP.; FEDERAL SIGNAL CORP.
(FINLAND) OY AB,

Defendants, Appellants.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph Tauro, U.S. District Judge]

---

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge, and
Howard, Circuit Judge.

---

John A. Sakakeeny, with whom were Stephen W. Sutton and Sutton
& Sakakeeny, LLP, on brief for appellee Restoration Preservation
Masonry, Inc.
Edward L. Kirby, Jr., Lauren A. Boice, and Edward L. Kirby,
Jr. & Assoc., were on brief for appellee Dunlop Equipment Co., Inc.
Barry Weiner, with whom were Christopher P. Litterio, and
Ruberto, Israel & Weiner, P.C., on brief for appellants Federal
Signal Corp. and Federal Signal Corp. (Finland) Oy Ab.
David A. Hilton, with whom was Morrison, Mahoney & Miller, on

brief for appellants Bronto Skylift, Grove Europe, Ltd. and Grove Worldwide Co., Inc.

James P. Donohue, with whom was Sloan & Walsh, on brief for appellants BET, PLC and PTP, Ltd.

--------

April 1, 2003

--------

**LYNCH**, <u>Circuit Judge</u>.   In 1993, there was a tragic construction accident caused by a collapsing mast climber -- mechanized scaffolding equipment with a mobile work platform that can hydraulically ascend a mast -- leaving one man dead and another with a life of pain and paralysis.   The families were paid approximately $8 million; the money came from Restoration Preservation Machinery, Inc. ("RPM") and Dunlop Equipment Co., Inc. ("Dunlop").   These two companies, the plaintiffs-appellees here, then sought in two 1996 state court actions to recover the money on theories of indemnification or contribution from five other companies, defendants-appellants here, in the complicated chain of sale of the defective mast climber: Grove Europe, Ltd., Grove Worldwide Co., Inc., Bronto Skylift ("Bronto"), BET, PLC, and PTP, Ltd.   Two additional defendants were added in 2000: Federal Signal Corp. ("Federal USA") and its subsidiary Federal Signal Corp. (Finland) Oy Ab ("Federal Finland").   Asserting in 2000 that these claims had to be arbitrated, the defendants removed the case to federal court and sought to compel arbitration pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 205 (2000).   The district court remanded and then denied the motion to compel arbitration as moot.   We affirm.

I.

On September 2, 1993, Charles MacGlashing and another brick mason, James Proctor, both employees of RPM, were working on

a renovation project at the Longwood Towers complex in Brookline, Massachusetts. MacGlashing and Proctor were removing stone from the parapet of one of the towers when the mast climber they were using collapsed. Both men fell eight stories to the ground. Proctor died; MacGlashing survived, but suffered serious injuries including broken bones, internal and neurological damage, a ruptured aorta and bladder, a perforated colon, and lung damage. MacGlashing was hospitalized for six months after the accident, and left partially paralyzed and in constant pain.

MacGlashing and his wife filed suit against Dunlop in federal court. Dunlop filed a third-party complaint against RPM, seeking indemnification pursuant to their lease agreement. The court granted summary judgment to the MacGlashings and Dunlop on Dunlop's third-party indemnification claim. As a result of a combined settlement with Dunlop and a verdict against RPM, the MacGlashings collected approximately $5.7 million dollars from Dunlop and RPM. RPM appealed the summary judgment ruling, but it was affirmed. MacGlashing v. Dunlop Equip. Co., 89 F.3d 932, 941 (1st Cir. 1996).

MacGlashing's ex-wife also filed suit against Dunlop, on behalf of MacGlashing's minor children, in state court. Proctor's family filed suit against Dunlop in state court as well. In both of the state court actions, Dunlop also entered third-party indemnification complaints against RPM. In each, summary judgment

was entered in Dunlop's favor on the indemnity claims against RPM. In the MacGlashing state action, MacGlashing's children and Dunlop received a judgment of $145,000 against RPM. In the Proctor state action, Dunlop and Proctor's heirs received a judgment of $2 million against RPM. In total, RPM paid over $7 million dollars. Dunlop paid approximately $1 million. Dunlop and RPM now seek indemnification or contribution from other companies in the chain of sale of the defective mast climber.

This chain dates back to 1993, when Bronto sold a number of new aerial lifts to a joint venture comprised of BET and PTP. As part of the purchase price, Bronto took in trade sixty used mast climbers from BET and PTP. At the same time, Grove Europe also sold aerial lifts to BET and PTP, receiving in trade sixty-two used mast climbers. (The mast climbers were manufactured by still another company, Access Engineering.) Grove Europe and Bronto then sold the used mast climbers to Dunlop. That sale took place on August 2, 1993. The bill of sale, which was signed by Bronto, Grove Europe and Dunlop, contains an arbitration clause:

> The construction, validity and performance of any contract shall be governed by the laws of England (including English conflict of laws) and all disputes which arise out of or in connection with any contract shall be settled by arbitration in England in accordance with provisions of the Arbitration Acts for the time being in force.

Dunlop took delivery of the mast climbers from BET and PTP depots. It then leased four mast climbers to RPM on July 7, 1993. The accident took place two months later.

Following the judgments in suits brought by the families of MacGlashing and Proctor, Dunlop and Restoration sought recovery from Bronto, Grove Europe, Grove Worldwide, BET, and PTP. Grove Worldwide is a U.S. company; its relation to Grove Europe, a British company, is not specified in the record. In August 1996, Dunlop filed suit in Suffolk Superior Court against Bronto, Grove Europe, BET, and PTP. The following month, RPM filed a similar suit in Middlesex Superior Court against Grove Europe, Grove Worldwide, and Bronto, for indemnification and contribution, and later amended the complaint to include negligence, negligent failure to warn, and breach of warranties. Grove Europe and Bronto responded by filing motions to dismiss for lack of personal jurisdiction. Grove Worldwide answered the complaint in June 1997 and asserted as one of its affirmative defenses that the parties were bound to submit the matter to arbitration. But it did not move to compel arbitration. RPM subsequently amended its claim to add BET and PTP as defendants. BET and PTP filed motions to dismiss for lack of personal jurisdiction. None of the motions to dismiss were granted. These two state court suits were ultimately consolidated in July 2000.

The parties engaged in discovery from 1997 through 2000. Five people were deposed, including two depositions in London. RPM and Dunlop exchanged requests for production of documents and interrogatories with defendants other than Grove Worldwide. Experts were retained to conduct failure analyses on the scaffolding equipment. Thirteen status conferences were held in the Middlesex Court litigation. During the course of discovery, plaintiffs learned that on August 4, 1995 Federal Finland had purchased the assets and liabilities of Bronto.

Federal USA, the sole shareholder of Federal Finland, joined the asset purchase contract as a guarantor. Under the contract, Federal Finland purchased all assets of Bronto, including Bronto's proprietary information, records, trade rights, and causes of actions. Federal Finland also assumed many of Bronto's liabilities. Product liability on items sold prior to the effective date of the transfer was excluded, except for claims "arising under contract or warranty."[1] The asset purchase contract limited assignment of assumed contracts only where consent was required and where the assignment itself constituted a breach of the pre-existing contract.

---

[1] Plaintiffs contend that this restriction does not include the mast climbers at issue, because the asset sale contract specifies products "manufactured, sold <u>and</u> delivered" prior to the effective date. (emphasis added) The mast climbers were not manufactured by Bronto.

In December 1999, RPM amended its complaint to add Federal USA, and in March 2000 further amended it to add Federal Finland, as necessary defendants. On June 12, 2000, Dunlop filed an amended complaint adding Federal USA and Federal Finland as defendants. Federal USA responded to RPM's amended complaint by filing a motion to dismiss in March 2000, asserting that Federal Finland was the party that had purchased Bronto's assets. Federal USA then sought to withdraw its motion to dismiss in April 2000 so that it could file for summary judgment. In May 2000, both Federals filed a notice of removal in state court based on diversity jurisdiction. However, they never filed the notice of removal in U.S. district court and shortly thereafter abandoned this effort to remove the case. Meanwhile, neither of the Federals conducted any discovery.

A trial date of September 18, 2000 had been scheduled. In June 2000, Federal USA moved to reset the tracking order to allow for a motion for summary judgment. At an August 2, 2000 status conference, all defendants filed a notice of removal to federal court, citing their intention to exercise their arbitration rights. On August 14, 2000, the plaintiffs filed a motion to remand the case to state court. Two weeks later, before the district court acted, the defendants filed a motion to compel arbitration and to stay the district court proceedings.

On February 22, 2001, the district court allowed the motion to remand to Middlesex Superior Court, citing this court's decision in Menorah Insurance Co. v. INX Reinsurance Corp., 72 F.3d 218 (1st Cir. 1995), and denied the defendants' motion to compel arbitration as moot. No further reasons were given. Defendants appeal the district court's ruling, arguing that the jurisdictional ruling was in error, and that there had been no waiver supporting the district court's ruling against compelling arbitration.

## II.

Plaintiffs argue that we lack jurisdiction to examine the remand order because it was based on a determination of the district court's lack of subject matter jurisdiction over the removed case. 28 U.S.C. § 1447(d) mandates that "[a]n order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise . . . ." Section 1447(d) applies where the district court finds that it lacks subject matter jurisdiction. The district court's opinion here is notably terse; we conclude from the citation to Menorah that the court reasoned that subject matter jurisdiction was lacking because of a waiver of the right to arbitrate by the defendants. The parties agree that is what the district court meant by the citation to Menorah.

Plaintiffs read § 1447(d) broadly as a blanket prohibition blocking any sort of appellate review of decisions remanding arbitration cases that had been removed to federal court

-8-

under 9 U.S.C. § 205 and subsequently remanded.  See, e.g., Transit Cas. Co. v. Certain Underwriters at Lloyd's of London, 119 F.3d 619, 625 (8th Cir. 1997) (remand order not reviewable on appeal). But see Beiser v. Weyler, 284 F.3d 665, 672-74 (5th Cir. 2002) (asserting appellate jurisdiction, criticizing conflation of jurisdictional and merits inquiries in remanding arbitration cases "into a single step," and arguing that the consequences of such a conflation are "both irrational and inconsistent with . . . precedents" because of the importance of international comity, the goal of development of a uniform body of law regarding the Convention, the international business community's need for predictability, and the general federal policy of solicitude toward arbitration).

In Menorah, we confronted a similar argument but declined to decide the jurisdictional issue, holding "Since [plaintiff] easily wins an affirmance on the substantive issue of waiver, we decline to decide the jurisdictional issues raised by it."  72 F.3d at 223 n.9 (citing Norton v. Mathews, 427 U.S. 524, 528-33 (1976) (where the merits can easily be resolved in favor of the party challenging jurisdiction, resolution of complex jurisdictional inquiry may be avoided)).  We follow a similar course here.  As the plaintiffs concede, "jurisdiction does not have to be resolved for this Court to enter a final ruling on the merits that the defendants have no right to arbitrate."

The decision in <u>Steel Co.</u> v. <u>Citizens for a Better Environment</u>, 523 U.S. 83 (1998), does not require that we reach the jurisdictional question. In <u>Steel Co.</u>, the Court attacked the practice of so-called "hypothetical jurisdiction," <u>id.</u> at 94, and concluded that "Article III jurisdiction is always an antecedent question," <u>id.</u> at 101. The Supreme Court itself has made it clear that <u>Steel Co.</u> does not establish an unyielding sequence of decision-making regardless of circumstances. <u>See</u> <u>Ruhrgas AG</u> v. <u>Marathon Oil Co.</u>, 526 U.S. 574, 578 (1999). In <u>Steel Co.</u>, Justice Breyer, concurring, noted with approval that "[t]his Court has previously made clear that courts may 'reserve difficult questions of . . . jurisdiction when the case could alternatively be resolved on the merits in the favor of the same party.'" 523 U.S. at 111 (quoting <u>Norton</u>, 427 U.S. at 532).

<u>Steel Co.</u> does not create an absolute rule against bypassing questions of a jurisdictional nature. <u>See</u> <u>Parella</u> v. <u>Ret. Bd. of the R.I. Employees' Ret. Sys.</u>, 173 F.3d 46, 53-54 (1st Cir. 1999). <u>Parella</u> noted that while Article III jurisdictional disputes are subject to <u>Steel Co.</u>, statutory jurisdictional disputes are not. <u>Id.</u> This rule is well established in this circuit. <u>See</u> <u>Davignon</u> v. <u>Clemmey</u>, Nos. 01-1862, 02-1293, 02-1346, 2003 WL 721803, at *5 (1st Cir. Mar. 4, 2003) (holding that an appellate court remains free to bypass problematic jurisdictional issues provided those issues do not implicate Article III 'case' or

-10-

'controversy' requirement); United States v. Woods, 210 F.3d 70, 74 n.2 (1st Cir. 1999) (following Parella and concluding that Steel Co. is limited to Article III subject matter jurisdiction issues); Kelly v. Marcantorio, 187 F.3d 192, 197 (1st Cir. 2000) (same, emphasizing that courts should not reach constitutional issues in advance of the necessity of deciding them); Cablevision of Boston, Inc. v. Pub. Improvement Comm'n, 184 F.3d 88, 100 n.9 (1st Cir. 1999) (following Parella); see also Seale v. INS, No. 02-1431, slip op. at 14 (1st Cir. Mar. 14, 2003) (identifying another exception to Steel Co., consistent with Parella, where a court's prior case law "foreordains" the outcome on the merits so as to deny recovery, a Steel Co. inquiry into jurisdiction is not required). Other circuits similarly have held that Steel Co. applies only to Article III constitutional limitations on jurisdiction. See Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 817 n.11 (2d Cir. 2000); Larsen v. Senate of Pa., 152 F.3d 240, 245 (3d Cir. 1998); Kauthar SDN BHD v. Sternberg, 149 F.3d 659, 663 n.4 (7th Cir. 1998); see also Ctr. for Reprod. Law & Policy v. Bush, 304 F.3d 183, 195 (2d Cir. 2002) (refraining from jurisdictional inquiry in case where outcome was "foreordained" by circuit precedent and noting that "[w]here the precise merits question has already been decided in another case by the same court, it is the adjudication of the standing question that resembles an advisory opinion -- the very concern that animates the Steel Co. rule").

-11-

Under <u>Parella</u> and its progeny, a jurisdictional inquiry is not required here given that the question invokes statutory jurisdiction.

III.

Review of a district court's determination of waiver of arbitration is plenary. <u>Navieros Inter-Americanos, S.A.</u> v. <u>M/V Vasilia Express</u>, 120 F.3d 304, 316 (1st Cir. 1997).

Analysis of the question of whether the right to arbitration was waived takes place against a backdrop of strong federal policy in favor of arbitration. <u>See</u> <u>Moses H. Cone Mem'l Hosp.</u> v. <u>Mercury Constr. Corp.</u>, 460 U.S. 1, 24-25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."). This policy "applies with special force in the field of international commerce." <u>Mitsubishi Motors Corp.</u> v. <u>Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 631 (1985). "[C]oncerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' agreement, even assuming that a contrary result would be forthcoming in a domestic context." <u>Id.</u> at 629; <u>see also</u> <u>Menorah</u>, 72 F.3d at 220-21.

The policy in favor of arbitration does not supersede basic contract principles, however. "The FAA directs courts to place arbitration agreements on equal footing with other contracts, but it 'does not require parties to arbitrate when they have not agreed to do so.'" EEOC v. Waffle House, Inc., 534 U.S. 279, 293 (2002) (quoting Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 478 (1989)). "[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes -- but only those disputes -- that the parties have agreed to submit to arbitration." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995).

Parties are free to waive their rights to arbitration by contract. Jones Motor Co. v. Teamsters Local Union No. 633, 671 F.2d 38, 42 (1st Cir. 1982) (Breyer, J.). Waiver can either be express or implied. Id. But "[w]aiver is not to be lightly inferred, and mere delay in seeking arbitration without some resultant prejudice to a party cannot carry the day." Creative Solutions Group, Inc. v. Pentzer Corp., 252 F.3d 28, 32 (1st Cir. 2001) (quotation omitted). In considering whether an implied waiver has taken place, federal courts traditionally consider an array of factors:

> [W]hether the party has actually participated in the lawsuit or has taken other action inconsistent with his right, . . . whether the litigation machinery has been substantially invoked and the parties were well into preparation of a lawsuit by the time an intention to arbitrate was communicated by the defendant to the

-13-

> plaintiff, . . . whether there has been a long delay in seeking a stay or whether the enforcement of arbitration was brought up when the trial was near at hand . . . . Other relevant factors are whether the defendants have invoked the jurisdiction of the court by filing a counterclaim without asking for a stay of the proceedings, . . . whether important intervening steps (e.g., taking advantage of judicial discovery procedures not available in arbitration . . .) had taken place, . . . and whether the other party was affected, misled, or prejudiced by the delay . . . .

Jones Motor, 671 F.2d at 44 (quoting Reid Burton Constr., Inc. v. Carpenters Dist. Council, 614 F.2d 698, 702 (10th Cir. 1980)). In Menorah, this court emphasized that "in order for plaintiffs to prevail on their claim of waiver, they must show prejudice." 72 F.3d at 221 (internal quotation omitted); accord Creative Solutions, 252 F.3d at 32.

### A. Waiver By Grove Europe, Grove Worldwide, Bronto, PTP and BET

Applying the Jones Motor factors to the parties that were defendants before 2000 (Grove Europe, Grove Worldwide, Bronto, PTP, and BET), the conduct of each constitutes an implied waiver.

There are no per se rules as to the length of delay necessary to amount to waiver, see Menorah, 72 F.3d at 222 (citing case in which thirteen months' delay was found insufficient to constitute waiver). Here, the four years' delay from filing in August 1996 to removal in August 2000, encompassing a period of active state court litigation, greatly exceeds that found acceptable in this circuit. See Creative Solutions, 252 F.3d at 33 (delay of five months is not waiver); see also Navieros, 120 F.3d

-14-

at 316 (one-month delay in context of expedited litigation sufficient to find waiver); Menorah, 72 F.3d at 222 (delay of more than fifteen months sufficient); Jones Motor, 671 F.2d at 42 (delay of more than one year sufficient).

The length of delay must be evaluated in the context of litigation activities engaged in during that time. See, e.g., Creative Solutions, 252 F.3d at 33 (waiver not found when there was no discovery or other activity aside from plaintiff's filing a request for production); Jones Motor, 671 F.2d at 42 (waiver found when party seeking arbitration engaged in deposition-taking, a pre-trial conference, cross-motions for summary judgment, and oral argument). The defendants here were involved in at least five depositions and thirteen pre-trial conferences. Prejudice to the plaintiffs is easily inferred from the necessary expenditures over that period of time. See Menorah, 72 F.3d at 222 (no error in finding that litigation expenses over the course of a more than fifteen-month delay amounted to prejudice); see also Navieros, 120 F.3d at 316 (prejudice found as a result of expenses related to litigation that would not have been incurred in arbitration proceedings).

Furthermore, the context of these defendants' belated assertion of their right to arbitrate also points to waiver. Removal to federal court to compel arbitration occurred in August 2000, less than two months before the scheduled trial date. Jones

<u>Motor</u> directs attention to "whether the enforcement of arbitration was brought up when the trial was near at hand."  671 F.2d at 44; see <u>Navieros</u>, 120 F.3d at 316 (moving for arbitration the day before trial considered as part of waiver analysis).  Given a four-year-long litigation, first raising arbitration less than two months before trial unquestionably constitutes invoking it "when the trial was near at hand."

Grove Worldwide stands in a slightly different posture. It asserted arbitration as an affirmative defense in its June 1997 answer to the Middlesex complaint.  Grove Worldwide never participated in document discovery.  But it also never followed up on its 1997 claim of arbitration and let the matter rest until 2000.  The length of its delay results in the same prejudice to plaintiffs and so Grove Worldwide has also waived.

B.   <u>Waiver By Federal USA and Federal Finland</u>

Defendants Federal USA and Federal Finland argue that they have not waived a right to arbitrate because the delay between the time they were joined as defendants and the time they moved to compel arbitration is not sufficient to establish prejudice. Federal USA was not served until January 2000 and Federal Finland was not joined as defendant by RPM until March 2000.  Dunlop, meanwhile, did not join either of the Federals as defendants until June 2000.  Subsequently, neither of the Federals participated in discovery.

-16-

We assume arguendo, in the Federals' favor, that they, as non-signatories to the contract containing the arbitration clause, may assert a claim to arbitration based on their relationship with Bronto.[2]  Still, Bronto clearly waived its right to enforce the arbitration clause,[3] and the Federals are bound by that waiver because it occurred before the plaintiffs had notice of the asset purchase.  See Restatement (Second) of Contracts § 336(2) (1981) ("The right of any assignee is subject to any defense or claim of the obligor which accrues before the obligor receives notification of the assignment, but not to defenses or claims which accrue thereafter except as stated in this Section or as provided by

---

[2]  While it is generally true that "a contract cannot bind a nonparty," Waffle House, 534 U.S. at 294, there are exceptions allowing non-signatories to compel arbitration.  A non-signatory may be bound by or acquire rights under an arbitration agreement under ordinary state-law principles of agency or contract.  See 1 G.M. Wilner, Domke on Commercial Arbitration § 10:00, at 1-2 & 3 n.5 (rev. ed. 2002).  A number of circuits have allowed a non-signatory to compel arbitration under a limited equitable estoppel theory.  See Grigson v. Creative Artists Agency, 210 F.3d 524, 527 (5th Cir. 2000); Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 757 (11th Cir. 1993); Hughes Masonry Co. v. Greater Clark County Sch. Bldg. Corp., 659 F.2d 836, 841 n.9 (7th Cir. 1981); see also Med. Air Tech. Corp. v. Marwan Inv., Inc., 303 F.3d 11, 18-19 (1st Cir. 2002) (noting existence of equitable estoppel).

[3]  Bronto did not raise arbitration as an affirmative defense; instead it filed a motion to dismiss for lack of personal jurisdiction in June 1998.  Bronto never raised its right to arbitrate at any time before 2000.  Moreover, Bronto participated in discovery, moving in September 1997 for more time to respond, and responding to RPM's request for document production in January 1998.  Through this delay, participation in litigation, and resultant prejudice to plaintiffs, Bronto waived its right to arbitrate before plaintiffs knew of the asset purchase.

statute.") (emphasis added); cf. U.C.C. § 9-318(1)(b), 3A U.L.A. 460 (1992) (rights of an assignee are subject to "any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment"); In re Calore Express Co., 288 F.3d 22, 47 (1st Cir. 2002) (applying Massachusetts law and finding that timing of notice of assignment under § 9-318(1)(b) governs outcome).[4]

Nevertheless, the Federals argue that they are not bound by Bronto's actions because those actions occurred after the August 1995 asset purchase. The Federals contend their rights as assignees are measured at the time of the assignment, and so plaintiffs -- the obligors -- cannot raise a defense of waiver based on Bronto's conduct. But as said, basic contract law principles do not limit obligors to only those defenses that arose before the assignment. Instead, the inquiry turns on when the

_____

[4] There is a lurking choice of law question. In diversity cases, we apply the forum state's choice of law rules. See Auto Europe, LLC v. Conn. Indem. Co., 321 F.3d 60, 64 (1st Cir. 2003). We do not decide here whether Massachusetts would enforce the contractual choice of law or its own law. The asset purchase contract incorporates Finnish law. However, parties do not argue that Finnish law governs the assignment, nor do they present relevant Finnish law. Under Massachusetts law, "we need not take judicial notice of the law of a foreign jurisdiction where, as here, it is not brought to our attention by the record or the briefs, and where, as here, counsel apparently tried the case on the theory that the relevant [foreign] law was the same as our own." Tsacoyeanes v. Canadian Pac. Ry. Co., 162 N.E. 23, 24 (Mass. 1959) (citations omitted). The parties have proceeded on state contract law, as do we.

obligor received notification of the assignment. As a result, the obligor can employ defenses that emerged subsequent to assignment:

> The assignee takes what the assignor had 'warts and all,' for an assignment does not deprive the obligor of any defenses or claims arising out of the agreement that the obligor could have asserted against the assignor absent assignment. The obligor may assert these defenses and claims against the assignee, regardless of whether the assignee knew of their existence at the time of assignment <u>or whether they had even come into existence at that time</u>.

3 E.A. Farnsworth, <u>Farnsworth On Contracts</u> § 11.8, at 106 (2d ed. 1998)(emphasis added). In short, the Federals are bound by Bronto's actions prior to the plaintiffs' 1999 discovery of the ownership change.

For these reasons, the Federals do not have a right to compel arbitration under the 1993 bill of sale.

## IV.

The district court's rulings on the motion to remand and denial of the motion to compel arbitration are **<u>affirmed</u>**.