# United States Court of Appeals
## For the First Circuit

No. 19-1896

JACKELINE BARBOSA,
individually and on behalf of others similarly situated,

Plaintiff, Appellant,

MARK ANDERSON, individually and on behalf of other similarly
situated; DOUGLASS BAKER, individually and on behalf of others
similarly situated,

Plaintiffs,

v.

MIDLAND CREDIT MANAGEMENT, INC; SCHREIBER/COHEN, LLC,

Defendants, Appellees,

LUSTIG, GLASER & WILSON, P.C.,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Thompson, Lipez, and Kayatta,
Circuit Judges.

Charles M. Delbaum, with whom National Consumer Law Center,
Kenneth D. Quat, Quat Law Offices, Alexa Rosenbloom, Nadine Cohen,
Matt Brooks, and Greater Boston Legal Services were on brief, for
appellant.

Cory W. Eichhorn, with whom Gordon P. Katz, Benjamin M. McGovern, and Holland & Knight LLP were on brief, for appellee Midland Credit Management, Inc.

Marissa I. Delinks, with whom Andrew M. Schneiderman and Hinshaw & Culbertson LLP were on brief, for appellee Schreiber/Cohen, LLC.

November 25, 2020

THOMPSON, **Circuit Judge**. This case dips us briefly into the vast pool of credit card debt collection efforts within the broader debt collection industry. Here's how it works. When a credit card company gives up on collecting an individual account in default (leading it to "charge-off" the debt), it bundles lots of individual accounts together and sells the bundle to a debt collection entity (otherwise known as the debt buyer). Peter A. Holland, The One Hundred Billion Dollar Problem in Small Claims Court: Robo-Signing and Lack of Proof in Debt Buyer Cases, 6 J. Bus. & Tech. L. 259, 264-65 (2011). Buying such bundles of individual consumer debt is a massive and lucrative industry; in 2016, the participating corporate entities disclosed revenue of over $13 billion. Midland Funding, LLC v. Johnson, 137 S. Ct. 1407, 1416 (2017) (Sotomayor, J., dissenting) (citing Consumer Financial Protection Bur., Fair Debt Collection Practices Act: Annual Report 2016, at 8). Some of this revenue is earned by winning default judgments in state small claims courts, where corporate entities who have bought consumer debt often win their gamble that individual consumers will not appear in court to defend against a debt collection action to the tune of "billions of dollars." Id. at 1417 (quoting Holland, supra, at 263).

The debt buyer in this case, Midland Funding LLC, lost this gamble with appellant Jackeline Barbosa, who showed up in

court to defend against the debt collection action and won, then chose to go on the offensive in federal court.

**HOW WE GOT HERE[1]**

A resident of Massachusetts, Barbosa opened a credit card account with Barclays Bank Delaware ("Barclays") in April 2011. The last payment she made on the account was in November 2012. By June 2013 (the last month for which we have a statement from this account), Barbosa was carrying an overdue, unpaid balance of $3,423.24.

In June 2015, Barclays sold this unpaid balance to Midland Funding LLC. To be more precise, Barclays sold Midland Funding a "series of accounts that originated with" it, à la bundling practice we referred to above. Midland Funding is an empty corporate shell entity (meaning it has no employees) which buys charged-off consumer debt from other entities. For example, when Midland Funding bought Barbosa's account from Barclays, her account was part of a "pool of charged-off accounts."

Midland Credit Management, Inc. ("MCM") manages the accounts purchased by Midland Funding, acting as its servicer and

---

[1] Heads up: As this "appeal arises from an order on a motion to compel arbitration in connection with a motion to dismiss, . . . we draw the relevant facts from 'the complaint and the parties' submissions to the district court' on the motion." Biller v. S-H OpCo Greenwich Bay Manor, LLC, 961 F.3d 502, 505 n.2 (1st Cir. 2020) (quoting Bekele v. Lyft, Inc., 918 F.3d 181, 184 (1st Cir. 2019)).

agent. The rights to Barbosa's account were assigned to MCM pursuant to a Servicing Agreement between Midland Funding and MCM. Schreiber/Cohen LLC is the law firm retained by MCM on behalf of Midland Funding to assist in MCM's debt collection efforts, including filing lawsuits against credit card debtors.

In August 2017, Midland Funding, as assignee of Barclays and represented by Schreiber/Cohen, filed a statement of small claim against Barbosa in the Boston Municipal Court, seeking to collect the unpaid credit card account balance plus court costs. The Municipal Court ultimately issued judgment in Barbosa's favor, concluding Midland Funding had not proved it owned the subject debt.

About a year later, Barbosa, along with two other individuals who similarly experienced the credit card collection practices of Midland Funding and MCM, sued MCM and Schreiber/Cohen (as well as one other law firm not involved with Barbosa's account) in federal district court, claiming the corporate entities violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692e and 1692f, by attempting to collect the credit card debt in the Massachusetts state court after the statute of limitations for the collection action had expired pursuant to

Delaware state law.[2]  The plaintiffs also claimed the violation of the FDCPA was a per se violation of Massachusetts General Laws, chapter 93A, § 2.[3,4]

MCM and Schreiber/Cohen each responded to the complaint with a motion asking the district court to compel arbitration pursuant to the arbitration election provision in each plaintiff's credit card agreement, to strike the class action allegations, to dismiss the complaint for failure to state a claim, and/or to stay the litigation pursuant to a variety of theories.  MCM primarily relied on the arbitration provision of the Barclays Cardmember Agreements.[5]  While Schreiber/Cohen argued that the complaint was

---

[2] The Barclays Cardmember Agreement stated that the agreement and Barbosa's account would be governed by Delaware state law and applicable federal law.

[3] Section 2 declares "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" to be unlawful.  Mass. Gen. Laws ch. 93A, § 2.

[4] The plaintiffs also sought class certification under Fed. R. Civ. P. 23.  We say little more about this part of the plaintiffs' claims because the district court struck these claims and this decision has not been challenged in this appeal.

[5] The first part of the long arbitration provision in Barbosa's Cardmember Agreement says:

> At the election of either you or us, any claim, dispute or controversy ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or your Account, or any transaction on your Account including (without limitation) Claims based on contract, tort (including intentional torts), fraud, agency, negligence, statutory or regulatory provisions

worthy of dismissal for failure to state a claim on several grounds, it also argued the district court should compel arbitration.

After a hearing, a magistrate judge issued a report and recommendation (an "R&R" to use court lingo) in which she focused primarily on the arbitration provision in the Barclays Cardmember Agreement. The magistrate judge concluded the agreement contained a valid arbitration provision which MCM and Schreiber/Cohen were authorized to enforce and recommended the district judge send the parties off to arbitration. In addition to suggesting the district judge grant the motion to compel arbitration, the R&R also suggested the district judge: (1) strike the class action claim, and (2) dismiss the amended complaint without prejudice. The

_____

or any other source of law and (except as specifically provided in this Agreement) Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved exclusively and finally by binding arbitration under the rules and procedures of the arbitration Administrator selected at the time the Claim is filed. The Administrator selection process is set forth below. For purposes of this provision, "you" includes any authorized user on the Account, and any of your agents, beneficiaries or assigns; and "we" or "us" includes our employees, parents, subsidiaries, affiliates, beneficiaries, agents and assigns, and to the extent included in a proceeding in which Barclays is a party, its service providers and marketing partners. Claims made and remedies sought as part of a class action, private attorney general or other representative action (hereafter all included in the term "class action") are subject to arbitration on an individual basis, on a class or representative basis.

plaintiffs filed a timely objection to the R&R but the district judge ultimately agreed with the magistrate judge, accepting and adopting her R&R in its entirety using a margin decision and issuing an order dismissing the plaintiffs' claims. Barbosa was the only plaintiff to file a notice of appeal. Her challenge to the district court's order focuses exclusively on the district court's conclusion that MCM and Schreiber/Cohen are authorized to compel Barbosa to arbitrate her claims against them.[6] As we explain below, the legal principles at play here lead us to affirm.

## STANDARD OF REVIEW

"We review a district court's denial of a motion to compel arbitration de novo." Nat'l Fed'n of the Blind v. The Container Store, Inc., 904 F.3d 70, 78 (1st Cir. 2018) (citing Kristian v. Comcast Corp., 446 F.3d 25, 31 (1st Cir. 2006)). "In conducting our inquiry, 'we are not wedded to the lower court's rationale, but, rather, may affirm its order on any independent ground made manifest by the record.'" Id. (quoting Campbell v. Gen. Dynamics Gov't Sys. Corp., 407 F.3d 546, 551 (1st Cir. 2005)).

## OUR TAKE

The central issue in this appeal is whether MCM and Schreiber/Cohen, two parties who were not signatories to Barbosa's Cardmember Agreement, can force her into arbitration. Barbosa

---

[6] As we mentioned before, Barbosa does not appeal from the part of the order striking the class action claim.

- 8 -

would like to us to answer this question with a resounding "no" and the appellees (of course) want us, like the district court, to say "yes."

Before we get into the weeds to resolve this issue, we begin with a general overview of the Federal Arbitration Act and how we generally consider arbitration provisions within contracts. Then we proceed to describe, based on the amended complaint and the documents filed in this case, the undisputed relationship statuses between the entities.

The Federal Arbitration Act, 9 U.S.C. §§ 1-16, has been in place since 1925, long recognized as Congress's solution to the courts' dim view of arbitration, "replac[ing] judicial indisposition to arbitration with a 'national policy favoring [it] and plac[ing] arbitration agreements on equal footing with all other contracts.'" Nat'l Fed'n of the Blind, 904 F.3d at 79 (second and third alterations in original) (quoting Hall St. Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576, 581 (2008)).

> As enacted, the FAA promotes a liberal federal policy favoring arbitration and guarantees that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

Id. (quoting 9 U.S.C. § 2).

"The FAA allows one party to an arbitration agreement to ask the court to put the litigation on hold and force the other party to arbitrate the disputes." Rivera-Colón v. AT&T Mobility P.R., Inc., 913 F.3d 200, 207 (1st Cir. 2019) (citing 9 U.S.C. § 4); see also 9 U.S.C. § 3. Basically, "[t]he Federal Arbitration Act requires courts to enforce private arbitration agreements." New Prime Inc. v. Oliveira, 139 S. Ct. 532, 536 (2019). The FAA treats these agreements as "contract[s], and courts must enforce arbitration contracts according to their terms." Biller, 961 F.3d at 508 (quoting Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 529 (2019)).

"A party seeking to compel arbitration under the FAA must demonstrate that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope." Id. (quoting Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d 367, 375 (1st Cir. 2011)). (As we will get into soon, the only disputed element in this case is whether the moving parties (here MCM and Schreiber/Cohen) were entitled to enforce the arbitration provision in the Cardmember Agreement.) "If the movant [shows all four elements], the court has to send the dispute to arbitration 'unless the party resisting arbitration specifically challenges the enforceability of the arbitration clause itself . . . or claims

- 10 -

that the agreement to arbitrate was never concluded.'" Id. (quoting Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 301 (2010)). "Those issues, which implicate 'whether or not a dispute is arbitrable,' are typically for the court to decide." Id. (quoting Dialysis Access Ctr., LLC, 638 F.3d at 375).

Barbosa is not challenging either the validity of the arbitration provision or the formation of the Cardmember Agreement in which the arbitration provision sits. Instead, her challenge is narrowly focused on whether MCM and Schreiber/Cohen have the contractual authority to enforce the Agreement's arbitration provision by virtue of their status as non-signatories to the agreement and agents of Midland Funding, to whom Barclays assigned its contractual rights to Barbosa's credit card account.[7]

---

[7] A quick aside about governing law: Barbosa alleged in her complaint that Delaware law governs the Cardmember Agreement and she has argued in all of her papers that Delaware law governs. The appellees do not dispute this principle and, while the Cardmember Agreement expressly states it is governed by Delaware law, the district court applied both Delaware and Massachusetts state law, finding no significant differences between the two states for the issues at hand. Indeed, "[b]ecause arbitration is a creature of contract, 'principles of state contract law control the determination of whether a valid agreement to arbitrate exists'" as well as other principles of contract interpretation. Rivera-Colón, 913 F.3d at 207 (quoting Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 475 (1st Cir. 2011)). While Barbosa has not challenged the validity of either the Cardmember Agreement or the arbitration provision within it, we will look to Delaware state law when we dig into some of the contract law principles at play in this case.

- 11 -

There is no doubt that MCM and Schreiber/Cohen's non-signatory status to the Cardmember Agreement is not in and of itself dispositive for this issue. While in general a "contract cannot bind a non-party[,] . . . 'there are exceptions allowing non-signatories to compel arbitration' and . . . 'a non-signatory may be bound by or acquire rights under an arbitration agreement under ordinary state-law principles of agency or contract.'" Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d 1, 9-10 (1st Cir. 2014) (alteration omitted) (quoting Restoration Pres. Masonry, Inc. v. Grove Eur. Ltd., 325 F.3d 54, 62 n.2 (1st Cir. 2003)); see also id. at 10 n.22 (citing with approval several cases from other circuits "acknowledging that non-signatories may have rights under an arbitration contract under certain circumstances.").

Before turning to our analysis of whether MCM and Schreiber/Cohen have the requisite authority to enforce the arbitration provision in the Cardmember Agreement, it will be helpful to lay out the undisputed relationships between the various parties as presented in Barbosa's complaint and in the documents the appellees submitted in support of their motions to compel arbitration, as well as what the various relevant contractual provisions in these supporting documents say. None of the parties are disputing the following:

- The validity of the Cardmember Agreement as a valid contract between Barbosa, Barclays, and Barclays' assigns or that this contract includes both valid assignment and arbitration provisions.[8]

- Midland Funding is an assignee of Barclays; the express assignment is in the "Bill of Sale" submitted with MCM's motion to compel arbitration as well as reflected in the "Portfolio Level Affidavit of Sale," also submitted in support of the motion.[9]

- MCM is the servicer and agent of Midland Funding; Barbosa admits as much in her complaint ("MCM has been Midland

---

[8] The assignment provision within the Cardmember Agreement reads:

> We may at any time assign or sell your Account, any sums due on your Account, this Agreement or our rights or obligations under this Agreement. The person(s) to whom we make any such assignment or sale shall be entitled to all of our rights under this Agreement, to the extent assigned.

The arbitration provision is long, but the first sentence establishes the general authority to elect arbitration:

> At the election of either you or us, any claim, dispute or controversy ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or your Account . . . shall be resolved exclusively and finally by binding arbitration under the rules and procedures of the arbitration Administrator selected at the time the Claim is filed.

[9] The Bill of Sale between Barclays and Midland Funding regarding the Bulk Debt Sale Agreement "assign[ed], convey[ed], grant[ed] and deliver[ed] [to Midland Funding] . . . all [Barclays'] rights title and interest . . . in and to those certain evidences of debt," including Barbosa's credit card debt.

The Portfolio Level Affidavit of Sale stated that Barclays "sold, transferred, assigned, conveyed, granted, bargained, set over and delivered" to Midland Funding "and its successors and assigns, good and marketable title to the [pool of charged-off accounts] and any unpaid balance free and clear of any encumbrance . . . ."

Funding's servicer and agent with respect to collecting charged-off consumer debts acquired by Midland Funding") and MCM submitted a declaration in support of its motion stating:

> MCM is the servicer and authorized agent for Midland Funding and manages the accounts that Midland Funding purchases. Midland Funding is an indirect subsidiary of MCM. Midland Funding has no employees and is a completely passive entity. To that end, MCM fully services accounts owned by Midland Funding and takes any and all actions on those accounts on behalf of Midland Funding.

- Schreiber/Cohen is Midland Funding's agent. In Barbosa's complaint, she alleges Schreiber/Cohen engaged in its debt collection activities "on behalf of Midland Funding and MCM" and, in her briefing, she refers to the law firm as Midland Funding's agent.

So that's what everyone agrees on. The disagreement lies in whether the arbitration provision authorizes MCM and Schreiber/Cohen to elect arbitration and enforce this provision. To that end, the crux of the parties' dispute centers on the following language in the first paragraph of the arbitration provision:

> For purposes of this provision, "you" includes any authorized user on the Account, and any of your agents, beneficiaries or assigns; and "we" or "us" includes our employees, parents, subsidiaries, affiliates, beneficiaries, agents and assigns, and to the extent included in a proceeding in which Barclays is a party, its service providers and marketing partners.

The district court considered and relied on this language, the assignment provision in the Cardmember Agreement, and the actual

- 14 -

assignment of rights to Barbosa's account to Midland Funding memorialized in the "Bill of Sale" when it concluded the following:

> (1) Midland Funding now stands in the shoes of Barclays so Midland Funding's affiliates, agents, and assigns, etc. are entitled to invoke the arbitration provision just as Barclays' affiliates, agents, and assigns, etc. could have invoked the provision.

> (2) MCM and Schreiber/Cohen fall within the definition of "us" in the language quoted above because both are agents of Midland Funding and, therefore, each has the authority to invoke the arbitration provision.

Barbosa disagrees with both conclusions for reasons which we discuss in turn.[10]

### Standing in Barclays' Shoes

Before we can dive into who has the authority to enforce the arbitration provision, we examine the implications of Midland Funding as Barclays' assignee. Barbosa argues the district court got it wrong when it concluded Midland Funding stands in Barclays' shoes such that Midland Funding has all the same rights as Barclays

---

[10] We take a brief moment to note that all three parties to this appeal rely heavily on decisions from district courts around the country addressing factual scenarios in similar procedural postures. The parties spill quite a bit of ink arguing why these cases are either analogous to -- or distinguishable from -- the facts at hand here. None of these decisions carry the day because they are, at best, persuasive. See Camreta v. Greene, 563 U.S. 692, 709 n.7 (2011) (stating that "[a] decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (quoting 18 J. Moore et al., Moore's Federal Practice § 134.02[1][d], p. 134–26 (3d ed. 2011))). We are guided instead by the language of the contracts at play here and the applicable general contract principles.

under the Cardmember Agreement. According to Barbosa, to so conclude creates contract provision surplusage, which is against basic principles of contract interpretation, because Midland Funding can't be both Barclays' assignee and standing in for Barclays itself.

MCM says no way -- the principle that an assignee stands in the shoes of an assignor's contractual rights is well-settled and this principle does not result in the definition of "us" being superfluous. Schreiber/Cohen, for its part, read Barbosa's argument slightly differently, pointing out that the district court's consideration of both the assignment provision and the arbitration provision does not result in impermissible surplusage, but instead demonstrates the proper application of the contract interpretation principle of reading the contract as a whole and giving effect to each provision. In her reply brief, Barbosa shifts her argument a little by asserting that, if Midland Funding is considered to stand in for every mention of Barclays within the Cardmember Agreement, then the list of relationships in the arbitration provision's definition of "us" (i.e., "employees, parents, subsidiaries, affiliates, beneficiaries, agents and assigns . . . ") is superfluous. We agree with the appellees.

As we stated above, there is no dispute the Cardmember Agreement included an assignment provision giving Barclays permission to "at any time assign or sell your Account" and

- 16 -

providing that "the person(s) to whom we make any such assignment or sale shall be entitled to all of our rights under this Agreement, to the extent assigned."  There is also no dispute Barclays assigned its full contractual rights to Barbosa's credit card account to Midland Funding.  A long-standing given in contract law is indeed that an "assignee stands in the shoes of the assignor."  MacKenzie v. Flagstar Bank, FSB, 738 F.3d 486, 494 (1st Cir. 2013) (quoting R.I. Hosp. Trust Nat'l Bank v. Ohio Cas. Ins. Co., 789 F.2d 74, 81 (1st Cir. 1986)).  In her brief, Barbosa does not provide any support, beyond her blanket assertion, that this conclusion is in conflict with binding contract law. Therefore, contrary to what she asserts, pursuant to the assignment provision and the express assignment of "all" rights to Barbosa's account in the "Bill of Sale," Midland Funding does in fact stand in Barclays' shoes as its assignee and now has all the same rights regarding Barbosa's account as Barclays had when the Cardmember Agreement was formed.  And because of that, in the wake of the assignment, Midland Funding becomes, as Barclays once was, the "other" referred to in the arbitration provision, and MCM and Schreiber/Cohen become "agents . . . of the other" (recall the arbitration provision kicks off with "[a]t the election of either you or us, any claim, dispute or controversy ("Claim") by either you or us against the other, or against the employees, agents or

assigns of the other . . ."). So Barbosa's claims against both appellees are within the arbitration clause's sweep.

To so conclude does not, as Barbosa asserts, render any other part of the Cardmember Agreement surplusage. Another well-settled principle of contract law (using the Delaware Supreme Court's words) tells us to "read a contract as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage." Bank of N.Y. Mellon v. Commerzbank Capital Funding Tr. II, 65 A.3d 539, 549 n.30 (Del. 2013) (quoting Kuhn Constr., Inc. v. Diamond State Port Corp., 990 A.2d 393, 396–97 (Del. 2010)). Barbosa does not provide a detailed argument about how this conclusion results in impermissible surplusage. She does express her view that "[a] general assignment of account rights does not override explicit contract language restricting the parties who may enforce an agreement to arbitrate." Barbosa is not wrong on this point but, in our view, the assignment and arbitration provisions within the Cardmember Agreement are not in conflict, they co-exist: The assignment provision articulates Barclays' authority to assign all its rights to Barbosa's account to another entity, whereas the arbitration provision specifically sets out what kinds of relationships with the account owner are required before an entity related to the account owner can elect arbitration. The bottom line is there is no surplusage resulting from the district court's interpretation of the Cardmember

- 18 -

Agreement.  As a result of the assignment from Barclays to Midland Funding, the latter is authorized to enforce the contractual rights created by the Cardmember Agreement, including delegating enforcement of the contractual provisions to one or two of its agents to act on its behalf, as we examine next.

<u>Who Can Elect Arbitration</u>

According to Barbosa, MCM and Schreiber/Cohen lack the authority to elect arbitration and enforce the Cardmember Agreement's arbitration provision because these entities do not have a direct relationship with Barclays and do not otherwise fall within any part of the definition of "us" provided in the provision.  The relevant part of the arbitration provision states:

> At the election of either you or us, any claim, dispute or controversy ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or your Account . . . shall be resolved exclusively and finally by binding arbitration . . . . For purposes of this provision, "you" includes any authorized user on the Account, and any of your agents, beneficiaries or assigns; and "we" or "us" includes our employees, parents, subsidiaries, affiliates, beneficiaries, agents and assigns, and to the extent included in a proceeding in which Barclays is a party, its service providers and marketing partners.

The way Barbosa reads the first part of the definition ("our employees, parents, subsidiaries, affiliates, beneficiaries, agents and assigns"), the arbitration provision does not authorize the agents and affiliates of a Barclays' assignee (e.g., Midland Funding) to enforce this provision, so the only entities with the

- 19 -

authority to elect arbitration are -- literally -- Barclays and Barclays' "employees, parents, subsidiaries, affiliates, beneficiaries, agents and assigns." So, in Barbosa's thinking, Midland Funding could elect arbitration but Midland Funding's agents and assigns, etc. cannot. MCM and Schreiber/Cohen disagree and assert that, because Midland Funding has the same contractual rights as Barclays, Midland Funding's agents have the authority to enforce the arbitration provision.

The arbitration provision clearly allows the account owner and the account owner's "employees, . . . agents and assigns" to elect arbitration and enforce this provision. Because Midland Funding has the same rights as Barclays had to enforce the Cardmember Agreement, Midland Funding's agents fall squarely within the arbitration provision's definition of "us" and may therefore elect arbitration on Midland Funding's behalf. As we stated previously, the record shows MCM acted as an agent of Midland Funding. Barbosa admitted as much in the allegations of her complaint, and MCM provided evidence to this effect in a declaration MCM submitted in support of its motion to compel arbitration.

Turning our attention to Schreiber/Cohen, Barbosa identified this law firm in her complaint as engaging in debt collection activities "on behalf of Midland Funding" and, in her reply brief, referred to this law firm as Midland Funding's agent.

- 20 -

As Schreiber/Cohen argues, they are Midland Funding's agent as a matter of law. See Comm'r v. Banks, 543 U.S. 426, 436 (2005) (recognizing "[t]he relationship between client and attorney, regardless of the variations in particular compensation agreements or the amount of skill and effort the attorney contributes, [a]s a quintessential principal-agent relationship") (citing Restatement (Second) of Agency § 1, Comment e (1958) (stating an attorney is an agent under basic principles of agency)). As Midland Funding's legal counsel, Schreiber/Cohen was authorized to act on its behalf and under its direction, including writing and filing motions to enforce the provisions of the contract to which Midland Funding had the proper authority to enforce.

Not so fast, says Barbosa. She places much emphasis on the second clause in the definition at issue -- "'we' or 'us' includes our employees, parents, subsidiaries, affiliates, beneficiaries, agents and assigns, *and to the extent included in a proceeding in which Barclays is a party, its service providers and marketing partners*" (emphasis added) -- arguing this clause also does not bring either MCM or Schreiber/Cohen within the definition of "us." Barbosa argues this part of the definition is a more specific articulation of to whom the definition applies and so should control the first part of the sentence's general definition. As Barbosa sees it, even if MCM and Schreiber/Cohen are service providers, Midland Funding (if considered to now be in

Barclays' position) is not a party to this litigation because it is not a named defendant. As a result, she says, neither entity is authorized to enforce the arbitration provision based on this clause. MCM and Schreiber/Cohen respond that this "service provider" clause does not need to come into play at all because the first part of the definition ("'we' or 'us' includes our employees, parents, subsidiaries, affiliates, beneficiaries, *agents* and assigns . . ." (emphasis added)) expressly gives them authority as Midland Funding's agents. Schreiber/Cohen specifically argues this "service provider" clause is not a more specific part of the definition limiting the first part and doesn't preclude it from enforcing the arbitration provision as Midland Funding's agent. Once again, we think the appellees have the better understanding.

Based on our interpretation of the first part of this definition, this second clause is not applicable to the situation at hand because, as appellees argue, it does not come into play. Even if Midland Funding was a named defendant, the plain language indicates this clause is simply extending the list of entities that may be authorized to elect arbitration and is not intended to

limit the first part of the definition listing the entities with this authority.[11],[12]

Finally, we quickly touch on an alternative ground with respect to MCM's status vis-à-vis Midland Funding which MCM suggests we consider. According to a declaration from MCM, Midland Funding and MCM entered into a Servicing Agreement in which, "to the extent required and/or permitted by applicable law, [MCM] was

---

[11] For the first time before us, Barbosa argues another reason MCM and Schreiber/Cohen do not have the authority to enforce the arbitration provision: In the absence of a direct relationship with Barclays, Barclays did not indicate in the Cardmember Agreement that it intended non-signatory, third-party beneficiaries to be able to invoke the mandatory arbitration clause. As Barbosa herself concedes, however, the authority of a non-signatory to enforce a contractual provision can be based on different grounds such as agency or third-party beneficiary principles. Because we hold MCM and Schreiber/Cohen had the authority to enforce the arbitration provision as agents of Midland Funding and Barbosa is making this third-party-beneficiary argument for the first time before us, we need not reach her arguments on this point.

[12] Barbosa also makes a preemptive argument that the doctrine of equitable estoppel does not prevent her from denying the appellees' right to invoke the arbitration provision. Because the appellees argued this point to the district court, Barbosa was apparently anticipating they would make a similar contention before us in case we disagreed with the district court's conclusion that MCM and Schreiber/Cohen have the authority to enforce the arbitration provision. She was right, they did. The district court dodged the equitable estoppel issue, concluding in a footnote that, because it concluded "MCM ha[d] the right to invoke the arbitration provision, it need not address MCM's argument that the plaintiffs should be equitably estopped from avoiding arbitration." Our response to Barbosa's preemptive argument is the same as the district court's: We need not address whether Barbosa should be equitably estopped from fighting the appellees' election to arbitrate because we resolved the primary issue in favor of the appellees.

assigned the rights in and to certain accounts, including the Barbosa Account." Additionally, according to the "Portfolio Level Affidavit of Sale," Barclays "sold, transferred, assigned, conveyed, granted, bargained, set over and delivered" to Midland Funding "*and its successors and assigns*, good and marketable title to the [pool of charged-off accounts] and any unpaid balance free and clear of any encumbrance . . . ." (Emphasis added.) The district court did not expressly take these documents into account but MCM urges us to consider its status as an assignee of Midland Funding as well as of Barclays itself as alternative grounds to affirm the district court's conclusion that MCM has the requisite authority to enforce the arbitration provision. Remember, in our de novo review of this issue, "we are not wedded to the lower court's rationale, but . . . may affirm its order on any independent ground made manifest by the record.'" Nat'l Fed'n of the Blind, 904 F.3d at 78 (alteration omitted) (quoting Campbell, 407 F.3d at 551).

MCM's declaration indicates that an official assignor/assignee relationship exists between Midland Funding and MCM. Moreover, pursuant to the language in the "Portfolio Level Affidavit of Sale," Barclays apparently specifically contemplated that Midland Funding may engage its own assignees when it exercises its rights with respect to Barbosa's account and assigned the rights to Midland Funding and Midland Funding's assigns. MCM,

- 24 -

therefore, acted not only as Midland Funding's agent but also as Midland Funding's assignee, and was authorized on both levels to enforce the arbitration provision.[13]

---

[13] One final issue bears mentioning because the parties have addressed it in their briefs and it was the subject of some interest during oral argument. MCM attempted to convince the district court that Barbosa's arguments against compelling arbitration of her claims are actually questions of arbitrability that fall under the arbitration provision's delegation clause. Among many details, the arbitration provision also states "[c]laims regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved exclusively and finally by binding arbitration under the rules and procedures of the arbitration Administrator selected at the time the Claim is filed." MCM says this delegation clause clearly handed the decision of whether MCM had the authority to invoke the arbitration provision to an arbitrator. The district court disagreed and reminded MCM that, according to this Court, "questions about whether an arbitration provision binds a party that did not sign the agreement are presumptively for the court to decide." (Citing Kristian v. Comcast Corp., 446 F.3d 25, 39 (1st Cir. 2006)).

Before us, MCM argues that the district court got it wrong on this point because the Cardmember Agreement required the arbitrator, not the court, to decide whether MCM could compel arbitration, and the district court can't ignore that language within the arbitration provision. MCM urges us to consider sending the entire question of whether it has the authority to invoke the arbitration provision to an arbitrator. In her reply, Barbosa of course disagrees and argues the district court got it right.

We have previously acknowledged that "parties may agree to have an arbitrator decide not only the merits of a particular dispute but also gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy [but they] must do so . . . by 'clear and unmistakable' evidence." Biller, 961 F.3d at 509 (quoting Henry Schein, Inc., 139 S. Ct. at 529, 530). We employ a presumption, however, that courts (instead of arbitrators) resolve gateway disputes about whether a particular arbitration clause binds parties in a particular case, especially when the dispute centers on whether "an arbitration contract binds parties that did not sign the agreement." Kristian, 446 F.3d at 39 (citing First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938

## WRAPPING UP

Because we conclude MCM and Schreiber/Cohen have the authority to enforce the arbitration provision, we must "send the parties off to arbitrate" Barbosa's claims. <u>Rivera-Colón</u>, 913 F.3d at 208. The district court's order granting MCM and Schreiber/Cohen's motions to compel Barbosa's claims to the arbitration process is **<u>affirmed</u>**. Each party to bear its own costs.

---

(1985)). In our view, the language in the arbitration provision stating that "the applicability of this arbitration clause . . . shall be resolved . . . by binding arbitration," does not provide the "clear and unmistakable evidence" that the parties intended an arbitrator to determine whether the parties attempting to enforce the arbitration provision had the requisite authority to do so. <u>Biller</u>, 961 F.3d at 509. The district court properly decided this issue.